A92A1028. ROGERS v. THE STATE.
(426 SE2d 209)

SOGNIER, Chief Judge.
Neil Rogers pled guilty to possession of cocaine with intent to distribute, and he appeals, contending the trial court erred by denying his motion to suppress. The record reflects that the trial court sufficiently indicated its exercise of discretion to accept appellant's plea of guilty on the condition that he preserved his right to appeal the ruling on his motion to suppress. *Springsteen v. State*, 206 Ga. App. 150 (424 SE2d 832) (1992).

"When we review a trial court's decision on a motion to suppress, the evidence is construed most favorably to uphold the findings and judgment of the trial court; the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous and will not be disturbed if there is any evidence to support them. [Cits.]"

*State v. Corley*, 201 Ga. App. 320 (411 SE2d 324) (1991). The trial court heard testimony by Glynn County Police Officer Jonathan Bunn that while on routine patrol around 6:00 a.m. on January 12, 1990, he observed a van parked near a dumpster in an unlit area behind an open gasoline station adjacent to the Highway 17 exit off Interstate 95. Bunn testified that the police "always check out any vehicles we see" in that area because it was a known drug trafficking area. As Bunn drove past the van, he saw a man exit the van, look around, spot Bunn's patrol car, then "very quickly" re-enter the van. Bunn saw another person's head "stick up out the end" of the van and then go back down and not reappear. The van had a temporary Maryland license plate.

Bunn testified that based on these events he parked behind the van and that appellant opened the van's door in response to the officer's knock. At Bunn's request appellant stepped outside and produced a Virginia driver's license and other documentation[1] for the van, which appellant told Bunn belonged to him. Appellant also informed Bunn that he and his daughter, the other passenger in the van, had stopped in order to rest on their trip from a family reunion in Florida to their home in the Washington, D. C. area.

Shortly after Bunn initiated contact, appellant became so noticeably and extremely nervous that Bunn asked twice about the reason for the nervousness but was given no explanation. Appellant also repeated himself when answering Bunn's questions. Bunn took appellant's driver's license and registration and began a computer check on their validity. While the check was in progress and while still retaining appellant's documents, Bunn returned to the van and continued questioning appellant, but did not discuss any possible parking, loitering, or traffic charges. Bunn testified that he "had a question" about the temporary license plate but "at that point, [I] didn't really honestly think anything was — you know, that the vehicle was stolen or anything. I just — basically who they were, what they were doing over in the dark area next to a business out in a very bad area. At that point, when I started talking with him and he kept repeating himself and he was getting more and more nervous, then I started feeling that something was wrong."

Bunn testified that because appellant was "getting more nervous," he asked appellant if he had any drugs or weapons on him. After appellant responded negatively, he seemed to become even more nervous. Bunn then asked appellant whether he would consent to a search of the van, explaining that the area was a high crime and

---

[1] Officer Bunn testified he thought the document involved the vehicle's insurance, but could not remember definitely. Appellant testified the document was the van's registration and the trial court so found.

drug area. Bunn was alone, his weapon was not drawn, and he did not threaten appellant or tell him he could not leave. Bunn testified that he produced a written consent form, on which he wrote a description of the vehicle, along with its tag and vehicle identification numbers, and gave it to appellant to read and sign, which appellant did. Bunn asked appellant's daughter to step outside the van and stand in the headlights of the patrol car, which she did. Bunn testified he then asked if he could search appellant's person and explained to appellant that his reason for doing so was for Bunn's safety, since it was early and Bunn was alone. Bunn testified that appellant "said he understood." Appellant emptied his right pants pocket but not his left pocket, in which Bunn observed a "very noticeable bulge." When Bunn inquired about the bulge, appellant started to step away but Bunn grabbed his arm and ordered him to remove the object in the pocket "very slowly" because Bunn "thought it was a weapon." Appellant produced a brown bag, which Bunn ordered him to drop, and as Bunn reached for it, appellant asked Bunn "if we could make a deal." Bunn looked inside the bag and found 35 small zip-lock plastic bags containing what was later ascertained to be crack cocaine. Bunn then arrested appellant. Bunn testified that after appellant was informed of his rights, he stated that his daughter knew nothing about the cocaine and that his intention had been to sell the cocaine because he was just an occasional user of the drug.

Appellant testified that he is a Washington, D. C. contractor and a native English speaker who graduated from technical colleges in England and has lived in the United States for approximately 20 years. He testified that he could not have moved his van "[w]ithout some problems" after Bunn parked behind him; that he asked for the return of his driver's license but Bunn told him he had not finished with it; that he did not ask Bunn to move the patrol vehicle "because I wasn't free to go"; that Bunn told him he did not have to sign the written consent to search the van; that he agreed "because I figured he would have searched anyway"; and that Bunn did not ask but instead told appellant he would search appellant's person "for his own safety." Appellant denied making any statements after Bunn discovered the cocaine.

The trial court denied appellant's motion to suppress, finding that under the totality of the circumstances appellant's consent to search was not invalidated by the retention of his driver's license and registration and that Bunn's frisk of appellant's person was reasonable under the circumstances.

1. Contrary to appellant's contention, it is well established that Officer Bunn was not required to have an "articulable suspicion" before he could approach appellant's stopped vehicle and talk with him. Communications between police and citizens involving no coer-

cion or detention are outside the domain of the Fourth Amendment, *O'Donnell v. State*, 200 Ga. App. 829, 831 (409 SE2d 579) (1991), and no seizure requiring a reasonable suspicion of unlawful activity occurs simply because a police officer approaches an individual and asks a few questions. *State v. Westmoreland*, 204 Ga. App. 312, 313 (1) (418 SE2d 822) (1992), applying *Florida v. Bostick*, 501 U. S. ___, ___ (111 SC 2382, 115 LE2d 389, 398) (1991). See *State v. Bryant*, 203 Ga. App. 69, 70-71 (416 SE2d 368) (1992). Given the time of the incident, the location of appellant's van, and the movement of appellant and his daughter as Bunn's patrol car passed the van, we find that Bunn's action in approaching the van and talking with appellant, including his request to see appellant's driver's license, constituted the type of routine traffic inquiry we held in *O'Donnell*, supra, not to intrude upon any constitutionally protected interest. Id. at 831-832.

2. Appellant contends that after Officer Bunn approached and talked to him, the encounter ceased being consensual and became a seizure for purposes of the Fourth Amendment when Bunn requested and retained appellant's driver's license and registration. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Citations and punctuation omitted.) *O'Donnell*, supra. The United States Supreme Court has further explicated the seizure test: "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer['s] requests or otherwise terminate the encounter." *Florida v. Bostick*, 115 LE2d at 401-402. See *Westmoreland*, supra at 313-314 (2).

An officer conducting a routine traffic stop may request and examine a driver's license and vehicle registration and run a computer check on the documents. See *United States v. Guzman*, 864 F2d 1512, 1519 (10th Cir. 1988). Accord *Florida v. Royer*, 460 U. S. 491, 501-502 (103 SC 1319, 75 LE2d 229) (1983) (airline ticket and driver's license). However, the evidence is uncontroverted Bunn did more than simply request, examine, and run a computer check of appellant's license. While retaining appellant's documents Bunn asked questions of appellant that did not relate to any traffic or parking violations but instead probed into appellant's possession of contraband or weapons and culminated in the officer's request to search both appellant's van and his person.

Considering all the circumstances surrounding the encounter, *Florida v. Bostick*, supra, we agree with appellant that when Bunn retained appellant's license, the encounter matured into an investiga-

tive stop protected by the Fourth Amendment. See *United States v. Thompson*, 712 F2d 1356, 1359-1361 (II) (11th Cir. 1983) ("[a] reasonable person [whose driver's license has been retained by a police officer] would not have believed himself free to leave." Id. at 1359); see also *United States v. Turner*, 928 F2d 956 (10th Cir. 1991) ("if the [police] officer retains the driver's license, he or she must have reasonable and articulable suspicion to question the driver about drugs or weapons. [Cit.]" Id. at 959 (I)). In so holding, we recognize that it is "crucial to focus on what the person's immediate 'business' is, in order to decide if the police retention of his papers would likely impede his freedom to proceed with it," *United States v. Jordan*, 958 F2d 1085, 1088 (D.C. Cir. 1992), and have considered that appellant was in a remote area off an interstate highway, hundreds of miles from his home, with only his van for transportation. The setting and time of the encounter in the case sub judice thus distinguishes it from *United States v. De La Rosa*, 922 F2d 675 (11th Cir. 1991), cited by the State in support of its assertion that no seizure resulted from the detention of appellant's driver's license, in which the police retained the accused's driver's license *after* he had arrived at his destination, exited his vehicle, and was proceeding toward his home on foot for the evening. "Thus, temporary retention of the license did not preclude [the accused] from terminating the encounter by going into his apartment." Id. at 678, n. 2. In the case at bar, appellant could not reasonably have believed himself free to leave: given his location, appellant was effectively immobilized without his driver's license since had he tried to drive away he could have been arrested for driving without a license. OCGA §§ 40-5-20; 40-5-29. See *Jordan*, supra; *United States v. Jefferson*, 906 F2d 346 (8th Cir. 1990); *Thompson*, supra.

3. Appellant asserts that his seizure and the subsequent search of his person (in the form of his compliance with Officer Bunn's direction to empty his pockets) were not based on any reasonable suspicion of unlawful activity.

The evidence shows that Bunn initially approached appellant after his curiosity was aroused by the location of the parked van and the behavior of appellant and his daughter as Bunn's patrol car passed the van. As in *O'Donnell*, supra at 831-832, it is not contended that these suspicions alone were sufficient to create a reasonable suspicion of unlawful activity. However, unlike *O'Donnell*, in which the officer's subsequent inquiries into the ownership of the accused's vehicle aroused a reasonable suspicion regarding his legal possession of the vehicle, Bunn's testimony established that he did not "honestly think . . . that [appellant's] vehicle was stolen or anything." Given Bunn's testimony that he did not suspect unlawful activity in regard to appellant's possession of the van, the only other evidence the situa-

tion presented to Bunn was that appellant had parked the van in an unlit area to enable his daughter and himself to take a brief rest; that they were traveling from a family gathering in Florida to their home in the Washington, D.C. area; that appellant spoke with a foreign accent; that appellant had a Virginia driver's license and was driving a van with temporary Maryland license plates; and that appellant displayed signs of extreme nervousness and repeated himself when answering the officer's questions. Contrary to the State's assertion, the transcript clearly reflects that Bunn did not see the bulge in appellant's pocket until *after* he requested appellant to empty his pockets as part of the search of his person. Compare *Pennsylvania v. Mimms*, 434 U. S. 106, 111 (98 SC 330, 54 LE2d 331) (1977).

Bunn testified that he decided to inquire about weapons and drugs and to request appellant's consent to search because he was "curious . . . why [appellant] was so nervous" and because of his "feeling that something was wrong," even though he testified that he did not know "what" was wrong.

Under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968), a police officer even in the absence of probable cause may stop persons, detain them briefly, and frisk them for the officer's safety where there is a reasonable suspicion that such persons are involved in criminal activity. The officer's action must be justified by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Footnote omitted.) Id. at 21. "[A] founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing." (Citation and punctuation omitted.) *O'Donnell*, supra at 832. A reasonable suspicion is more than a subjective, unparticularized suspicion or hunch. *Terry*, supra at 22; see also *Brown v. State*, 188 Ga. App. 184, 186 (372 SE2d 514) (1988).

" 'That [Officer Bunn's] "hunch" about [appellant] proved correct is perhaps a tribute to his policeman's intuition, but it is not sufficient to justify, ex post facto, a seizure that was not objectively reasonable at its inception. Because (the record contains no evidence that [Bunn] had) a reasonable suspicion that [appellant was] hauling drugs [or weapons], the stop cannot be upheld on that ground.' . . . [Cit.]" *Tarwid v. State*, 184 Ga. App. 853, 856 (1) (363 SE2d 63) (1987). Accord *United States v. Tapia*, 912 F2d 1367, 1371 (11th Cir. 1990) (evidence that car with out-of-state plates stopped for speeding was driven by visibly nervous Mexican with few pieces of luggage insufficient to support reasonable suspicion of criminal activity); *Thompson*, supra at 1361 (evidence of furtive gesture by occupant in car parked for abnormally long time at Florida airport insufficient). Compare *United States v. Turner*, supra at 959 (I) (evidence that driver of car not registered to him or passenger was nervous, as well

as officer's knowledge that auto mechanics, as driver claimed to be, did not have well-manicured hands and could not afford nice clothes and expensive audio equipment, sufficient to form reasonable suspicion of criminal activity). See also *Miranda v. State*, 189 Ga. App. 218, 220-221 (2) (375 SE2d 295) (1988) (airport case where lack of identification, one-way ticket purchased with cash, and accused's nervousness insufficient to establish existence of reasonable suspicion of wrongdoing).

Therefore, we agree with appellant that neither his seizure nor the subsequent search of his person was based upon a reasonable suspicion of criminal activity.

4. "The inquiry does not end with that determination, however, because if the subsequent search was pursuant to a voluntary consent which was not a product of the illegal detention, the taint of that illegal detention would not require suppression of the evidence. [Cit.]" *Miranda*, supra at 221 (3). The trial court in the case sub judice found under the totality of the circumstances that the retention of appellant's driver's license did not invalidate appellant's consent to search, citing factors that addressed the voluntariness of the consent which might have supported a determination that his consent to the body search was valid had the detention *not* been tainted. See *Hunter v. State*, 190 Ga. App. 52, 53-54 (1) (378 SE2d 338) (1989). "However, in order to eliminate any taint from an involuntary seizure or arrest, there must be proof *both* that the consent was voluntary *and* that it was not the product of the illegal detention. *Proof of a voluntary consent alone is not sufficient.* The relevant factors include the temporal proximity of an illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct. [Cits.]" (Emphasis supplied.) *Brown*, supra at 187.

The evidence surrounding Bunn's request to search appellant's person consists solely of Bunn's testimony that he explained to appellant the safety reasons for his request and that appellant said he "understood." This evidence is in marked contrast to Bunn's request to search appellant's *van*, regarding which Bunn informed appellant both orally and in writing that he could refuse to consent to the search. "In *United States v. Berry*, [670 F2d 583, 597-598 (5th Cir. 1982)], the court commented on the 'salutary practice of informing individuals that they are free to refuse consent to a search and to contact a lawyer,' " *Miranda*, supra at 221 (3), citing numerous cases where "the fact that the accused was told of those rights was one of the factors which supported a finding that the consent was voluntary." Id. "Considering that appellant was, at the time of [his] supposed consent to search, in illegal detention, that [he] was never informed of [his] right to refuse to consent to a search of [his] person . . . and that there is no evidence of any express giving of consent on

[his] part, [only his statement that he "understood" the reasons why Bunn wanted to search his person], we determine from the totality of the circumstances that, as a matter of law, there was no valid consent to search. The trial court erred in ruling otherwise." Id. Accord *Thompson*, supra (during contact lasting two minutes police officer who suspected no criminal activity first requested accused's driver's license and then, while retaining license, asked accused to hand him a vial he had seen placed on the car seat. Held, the accused's consent was tainted by the illegal detention).

The trial court erred by denying appellant's motion to suppress. See *Tarwid*, supra at 856 (1).

*Judgment reversed. McMurray, P. J., and Cooper, J., concur.*

DECIDED NOVEMBER 23, 1992 —
RECONSIDERATION DENIED DECEMBER 8, 1992 

*Lane & Crowe, Grayson P. Lane*, for appellant.
*W. Glenn Thomas, Jr., District Attorney, Kevin R. Gough, Assistant District Attorney*, for appellee.